May it please the court, Davina Chet on behalf of Xue Chong Dong. Your honors, the Sixth Amendment guarantees every defendant the right to a speedy trial, and the government has an affirmative constitutional obligation to bring a defendant to trial in a timely manner. Because of this, the burden is on the government to explain any post-indictment pretrial delay. Here, the government argues that it bears no responsibility for the three-year delay between Mr. Dong's indictment and his arrest in Canada. They claim this despite the fact that two weeks after the U.S. Attorney's Office had made a final determination to indict, the United States deported Mr. Dong to China. And they make this claim despite the fact that the government made no affirmative attempt to bring him to trial after he was indicted. In short, the government's position is that it can deport people to countries where it knows that there is no extradition treaty, and that it can do nothing to even notify the defendant that he's been indicted, and that this is consistent with the Sixth Amendment. But his lawyer asked that he be deported, right? His lawyer did ask that he be deported, but this was two months after he had already been in detention with no word that he was going to be indicted. In fact, the only contact he had with the investigating officers during the two months that he was in detention was when he affirmatively asked to speak to them, and no one told him that he was going to be indicted. In fact, at that time, the government's position was that they weren't sure whether they were going to indict him. It wasn't until several weeks later that the government made its final determination that they would indict him, and it was two weeks after that that Mr. Dong was deported. What evidence do we have in the record as to whether Mr. Dong knew or ever knew that he had been indicted or would be indicted? None. There's no evidence at all? There's no evidence in the record at all that he knew he would be indicted. So when his lawyer is asking that he be indicted, his lawyer has no idea that he's getting out two weeks ahead of the indictment? No. There's no evidence whatsoever of that. I kind of suspected that maybe he asked to get out because he thought he was going to get indicted, and that's why he asked to leave. You might suspect that, but that would be something that possibly the government would have information if the immigration attorney had made inquiries as to whether Mr. Dong was going to be indicted, but there is no evidence whatsoever in the record of that. There's no evidence that he knew he would be indicted. In fact, he asked to see the officers, and the officers did not tell him he was going to be indicted. In any event, the argument isn't that it's illegal to deport somebody. The argument is that if he asks to be indicted, let's say he says, I would like to be deported, and the government says, but we're planning on indicting you. Do you still want to be deported? Because if you get deported, we're still going to indict you, and then the first time you leave China, you're going to be brought back to the United States and face trial. That perhaps would be a different story. But in this case, there's no evidence whatsoever in the record that he knew he was going to be indicted. He had been in immigration detention for two months already. The government had forced him to request travel documents. He requested the travel documents. I mean, you know, they send him a form saying if you don't request the travel documents that will aid in your deportation, this will delay your deportation, and it will also lead you to criminal prosecution. So he does everything that the government asks him to do to aid in his own deportation. And then his attorney, usually people retain an immigration attorney because they think that there's some way that they cannot be deported. Presumably, this attorney told him, we don't know, it's not in the record. Presumably, the attorney said, there's no way for you to avoid deportation. So then they said, well, in that case, I ought to just go. That's not in the record. That's supposition as to what the attorney said. But it's also supposition that he knew he was going to be indicted. The government itself says that at that time it didn't know if it was going to indict him. So it's hard to lay on Mr. Dong's feet the fact that he should have known he was going to be indicted. Well, in theory, the government should have in its own possession evidence that it informed him. So I guess we'll hear from the government whether it has any evidence that it informed him, tried to inform him, or whatever. But I would put some of this, it's almost racist to lock word, right, put this on the government. I mean, if they informed him, they should know. Certainly. And even if Mr. Dong, we know that he asked to be deported. And I'm not saying that the government did anything wrong in deporting him. What I'm saying is that if you're going to deport someone to a country where you're later going to claim it's impossible to get him back, you need to at least advise him that he's going to be indicted. So at that point, the burden, the reason for delay could shift to Mr. Dong. This may be in the record and I just didn't pick it up. What was the reason for his deportation? He had previously applied for asylum and that asylum was denied. And when his asylum was denied, he was issued an order of deportation. He failed to show up to be deported and he remained in the United States for several years after that. So that when he was arrested on the credit card offense, the warrant for his deportation that had been issued previously popped up on their screen. So it was really an overstay. He came as a tourist and he overstayed his visa. And the reason he's incarcerated then is not just because of an outstanding deportation order. He's incarcerated because they picked him up on the credit card charge? You mean now or at that time? At that time. At that time, it was just because of the outstanding deportation. That's the government's argument throughout. Well, tell me what you mean about picked up on the credit card charge then. Well, I'm sorry. He was arrested on the credit card charge. Right. Well, he wasn't. They say he wasn't arrested at all. They say that when he was so they were investigating the credit card charge issue and they went to the place where he was going to pick up the package. And when they went there, he tried to leave. And so they stopped him. And they got his identification and they learned at that time that he had an outstanding warrant for deportation. So he was placed immediately into immigration detention. He was not ever in criminal detention. He was placed into immigration detention where he remained for three months. After two months in immigration detention and after one month after he, the Chinese government had already issued his travel documents, his attorney requested that he be deported. So this is a case where. But his attorney knew at that time, or at least should have known, that there was a possibility of indictment given that he'd been picked up, It's an immigration attorney, and I really couldn't tell you what that immigration attorney knew or didn't know. Well, wasn't there something going on between the local immigration authorities that wanted to keep him here? Yes. And they asked to do it? Yes. And then they, I thought that was interesting. Yes. Refreshed my memory on that. The Office of Investigation, the wing of DHS that investigates crime, had requested what's called a departure control order. And a departure control order is something that the deportation officers can issue if they have reason to believe that the individual's departure would be against the interests of the United States. And under the regulations, somebody who is a party to an investigation, a criminal investigation, so either a witness or a party, but in this case he would be the party to a criminal investigation, it's considered adverse to U.S. interest for that person to depart. And so under the regulations, the deportation officers should have issued a departure control order. If they had, in fact, issued that departure control order. And what we have here is the day that the travel documents were issued, the deportation officers emailed to the investigating officer a template letter to request a departure control order. So they sent it back, and there's emails that go back and forth. The deportation officer says, don't worry, he can't be deported until my boss sees your request for a departure control order. For reasons that are not in the record, so we don't know, the departure control order was never issued. If a departure control order had been issued, Mr. Dong would not have been deported. There were many ways for Mr. Dong to not have been deported. They could have issued a departure control order, they could have sworn out a criminal complaint, they could have used prosecutorial discretion to not deport him. There were many, many ways that Mr. Dong would not have been deported. None of those occurred. What happened was that he was deported, and then the government did nothing to bring him back. I mean, that's the other piece of this. Even if he had been deported, as in Lael del Carmen, this court recently held, they should have at least asked for his contact information or his address in case we need to bring you back. The government claims it didn't even do that. The record reflects otherwise, because, in fact, his home address is, and is his home address, is in the immigration file. But if they, if it wasn't, let's pretend it wasn't in the file. That's on the government. You know, I think that something in Doggett that was very interesting, as I was reading yesterday, is the government can hardly complain that it's their responsibility to bring people to trial, because if they just don't bother, that shows that if they're really going to do it. I thought the record showed that in China, your chances of getting somebody back are about zero. Well, you know, in Mendoza, the case this Court decided, similarly the chance of having somebody extradited back to the United States for a tax offense were about zero. And this Court held, nevertheless, that not even advising the person that they had been indicted and asking them to come back, that puts the burden on the government. The government, if you can't indict someone, you can't extradite someone, you at least have to tell them you've been indicted. If you come back to be prosecuted, then we'll prosecute you. If they had done that, then the speedy trial clock sort of would have stopped, because Mr. Dong, if he had said, well, I don't want to, I don't want to be prosecuted, then that would be his fault. But in this case, the government didn't even do that. They made no attempt. And when the Court asked, is it possible to even find people in China, the DOJ guy, the Department of State guy said, well, I don't know if you're aware of this or not, but we have an FBI agent on the ground in China. In other words, it is possible to find people in China. And in this case, they had his home address. Well, the fact they've got an FBI agent on the ground doesn't mean anything's going to happen. Right. But I think that what's important is Vendoza holds very clearly that if the only way that you can bring somebody to trial is to advise them that they've been indicted and ask them if they will return, then you have to do that. In this case, nobody advised him that he had been indicted and asked him to return. What they did was they basically let it drop. And as I was saying, in Doggett, it shows that it was not a high priority for the government to prosecute this case. If it had been a high priority, they would have done that, or they would have put out an Interpol red notice. Again, it's not on the record, but Mr. Dong traveled outside of China seven times before he came to Canada. I've seen his passport. If there had been an Interpol red notice or a blue notice, there would have been information that he was out of China those seven times. Instead, all they did was put it into NCIC. All they did was put it into NCIC, where Mr. Dong was actually able to They printed what? They put it into the NCIC, which is the FBI-controlled database. No, they did not. So they didn't put it on the international database. I'm looking here, because I've never seen this. I mean, I've seen all this stuff, of course, before coming here, but I've never seen this in any other case. You have this DAC's case comment screen, dated 6-29-2007, and it looks like the word comment. Do not removal without notifying case officer. Possible prosecution case. And then you've got something in handwriting. Graves, T.D. endorsed. And then there's something. Need departure of control order, Lynn. And then somebody by the name of Hatya sent to a person named Cox. Hatya is the deportation officer. And says, just to give you an update on Dong, the letter has gone through my chain of command and sent over to your F.O.D., whatever that means. Mr. Hayes' F.O.D. Field Office Director. As soon as I get word that it is approved, I will let you know. Thanks. And then in handwriting, O.I. wants to prosecute for something laptop with explicit material. Travel documents received. And then Jamie Holt sends out another message to Hatya. Is there any word on exactly what day Dong will be deported? And then Holt sends another note on August the 1st, 2007. Mr. Hatya says, welcome to my crazy yes-no life. Now the A.U.S.A.'s boss has signed off on the indictment. And I will be speaking with the A.U.S.A. tomorrow morning to see what day I can go before the grand jury and indict Dong. Either Friday or next week. Can you please give me an update on Dong? I'm sorry for all this, but please know it's out of my control. Thanks, Jamie. And then Holt sends another message on July the 31st. Says, OK, bad news. The chief of the A.U.S.A.'s office does not want to indict him until the end of August. And yes, he knows that Dong will probably already be out of the country by then. So I tried my hardest, but I guess I will have to work this case from another angle and get the rest of the group without Dong's assistance. Thank you again for all your help. Can you please send me a courtesy e-mail when he does depart? Thanks. And then Holt sends another. Then Hakia sends a note to Holt. Far as I know, no day to schedule as of yet. Thanks. Though the attorney on file is asking why he hasn't been removed already. So, he, he. Goes on like that. And from what I gather, some of the others say the local folks didn't want to have him deported. But somehow he was deported. That's correct. The only, absolutely, the local, well, the Office of Investigation, so the case agent. Here, written by Law Offices of David Lee Hsu, their deportation officer, July the 25th, 2007. I've been retained by Mr. Du Cheng Dong regarding the above-referenced case. Find Form G28 for your file. Mr. Dong is under final order of removal and the Chinese Consulate has issued a travel document to him. Respectfully request the ICE remove Mr. Dong as soon as possible. Thank you very much. And, here is, here is his, his, some travel documents. And, and then, Consul General, People's Republic of China. This goes to the Mira Loma Detention Facility. Enclosed here with are travel documents for the above-said person. Please let me know the schedule five days before their departure to China. If INS officers decide to escort them home, please also notify me. So I'll be able to assist them in obtaining visas. And it's signed by Kaben, who's the Consul. And then, And Consul General receives a letter from Lynn Ziegler, the deportation officer. The removal unit of the United States Immigration and Customs Enforcement in the Mira Loma Detention Facility is currently attempting to facilitate the expeditious return of Mr. Dong, who is a native and citizen of China, to his homeland. As this individual is presently in the custody of ICE, respectfully request that your office provide the necessary documentation to provide for the swift and safe journey home for Mr. Dong. For your records, on November 25, 1999, Mr. Dong was ordered removed by the immigration judge. And thank you in advance. And this goes on. Somehow the people here who are investigating this case, I got the impression that they were surprised that he was removed. Am I right about that? They didn't want him removed. They did not want him removed. They didn't want him removed, but the ICE people removed him. It's a matter of the left hand and the right hand knowing exactly what each other are doing, but the left hand saying that I'm not responsible for what the right hand is. Let me ask you this. Assuming that everything you say is true, and I draw all the inferences in favor of your client, that is to say, Mr. Dong had no inkling that there was an indictment coming down. The government is sort of having a left hand, right hand problem. They send him back to China. The government was entirely at fault for not notifying him in China, and the first time he knows anything about the indictment is when he shows up in Canada, which is about three years after the date of the indictment. Do you have cases that say that three years is too long without regard to prejudice? I have no Ninth Circuit case that says three years is too long. I have cases from the 11th, the 6th, and the 8th, I believe, that say that periods even short of three years are too long. Too long in the sense of, I mean, there are some cases that say, okay, this is so long you don't need to show prejudice. Yes. Other cases, they say, well, this is long, but because it's not too long, you've got to show some kind of prejudice. Yes. I have three cases that say three years is too long. Too long in the sense. Even so that you don't need to show prejudice, and that's Arenas Luna from the 8th Circuit, Ingram from the 11th Circuit, and Ferreira from the 6th Circuit. Okay. And moreover, it seems clear that the period has to be something short of five years. The government's taken the position that five years is sort of it has to be at least five years. But it seems clear that the period has to be something short of five years, because we know that this inquiry regarding delay is different in the post-indictment context than in the pre-indictment context. Well, I want to hear from the government on the point. Okay. Wasn't there an opinion by Justice Souter on this subject? Doggett. Huh? Doggett, Your Honor. Souter? Yes. Did he write on this? Yes, I believe he did. I believe Doggett is his case, and he is the case that says that at a certain point when government neglect lasts for too long, we may presume prejudice, because it's basically impossible to show some forms of prejudice. And so the lower courts have sort of started to try to figure out how long is too long. The Ninth Circuit has never addressed a case that involved three years, but I think that the egregiousness of the neglect in this case, I mean, it's not just neglect. This is reckless. This is a reckless indifference to him being deported, because everyone knows he is about to be indicted, and yet they deport him anyway. And they claim to not even bother to get his address. They did have his address, but they claim that they had no way of finding him. And then in terms of whether his departure is the important issue, in Mendoza, Mr. Mendoza left for the Philippines after an investigation started on him. He knew he was being investigated, and he left for the Philippines, and this court presumed prejudice. They said that the government was negligent in not telling him he needed to come back to be prosecuted, and the court actually presumed prejudice. He left the country voluntarily. All right. Thank you. Ms. Shea. The issue in this case is whether the post-indictment delay requires dismissal of the indictment. The district court weighed the four factors in docket and did not clearly err in finding that based on the record before it, one, defendant had made no showing of prejudice, and two, the government was not responsible for the delay, either post-indictment because the government could not make any overtures to the pre-indictment because the removal, quote, the removal is not a negative or a fault on the part of the government. And I will address this concern first because this appears to be what defense counsel is focused on in her argument. Defendant knew that he was under investigation. The district court found this. But the government knew. Apparently, one arm of the government wanted to keep him here. That is true. The other arm sent him away, knowing that, you know, one wanted to keep the other one, sent him away. I mean, that's crazy. Your Honor, the government disagrees that this is a left-arm, right-arm problem. As Your Honor is aware, there are Supreme Court cases on how long a defendant can be kept, not a defendant, an uncharged defendant can be kept in custody. Why would one agency say hold him and the other agency send him back to China? Under due process, Your Honor. You cannot hold an uncharged alien in administrative custody in prison. But they were looking to go for an indictment. But that would be an indefinite detention. There is no evidence in the record that the government was actually prepared to indict on a particular timeline. Well, we've got that piece of paper I read. Just because, Your Honor, just because an agent would like the government to indict someone does not mean that the government is about to indict someone. Well, I thought the agent was indicating that the U.S. Attorney's Office was advised of the exigency of the matter, and they needed to go before a grand jury, and seek an indictment. And then it was put off for quite a period of time. Your Honor, there is no... It was put off, and in the meantime, the other arm of the executive branch that was aware that the investigators wanted to keep him here, they turned around and off he goes. Your Honor, there is no evidence in the record that the indictment was ready and, quote, unquote, put off. No, no. The investigators or whoever was handling this wanted the U.S. Attorney's Office to go before a grand jury and get an indictment. It doesn't take long to go before a grand jury, does it? You just go up to whatever the floor is now. Forget, you know, 12th floor. And you get an FBI agent that comes in there or whoever, an agent, and says, you know, this guy here, he's done this and that, and you can get it in five minutes. Absolutely. As Your Honor is... Isn't that right? Yes, Your Honor. However, as Your Honor is aware, the U.S. Attorney's Office does not indict everyone that an agent would like to see indicted. And it completes its independent review of the evidence to determine whether or not a person should be indicted. And that goes through a number of levels of review within the U.S. Attorney's Office. Simply because an agent would like to see someone indicted on a particular timeline does not mean that the government is under any obligation under Marion and HOFA to do so. Well, of course that's right. And in a way it doesn't even matter whether it was a mistake, whether it was a deliberate decision or whatever. What happened was the government deports him before an indictment comes down. That's what they did. The government had the choice to do it otherwise. The government removed him, sent him back to China before the indictment comes down. What evidence, if any, is there that Mr. Dong knew that he had been indicted? None, Your Honor. Is there any evidence that he knew he might be indicted? Yes, Your Honor. And how strong is that evidence? The district court found that the defendant was aware that he was under investigation. Right. And the agents had interviewed him while he was in administrative custody, uncharged. And also the agents had conducted a search warrant on their account. And does that cut for or against the government? Meaning if I know I'm being investigated for a possible indictment, I'm then removed and nobody tells me nothing about whether I've been indicted or not, am I supposed to think, well, you know, they know how to get a hold of me. They could have kept me if they wanted to. They didn't. They haven't contacted me. They haven't held me in the United States. So I guess the investigation went away. So I'm not sure how it cuts that he knows he's being investigated. Because then, as far as he's aware, at least as far as the government can show, he's never notified that there's been an indictment. Yes, Your Honor. And they probably have his address. Your Honor, there is no evidence in the record that we – that the government has his address. There is a request for digital notice on that. Even assuming that that document comes in, it's an untranslated document, which really should be before the district court. That was produced to defense counsel before the hearing. In addition, let's say that the government has the address of the defendant. On that sheet of paper, it definitely does not have the phone number of the defendant. An FBI agent on the ground in China, China is extremely protective of its sovereignty. An FBI agent on the ground in China cannot just go banging on the doors of a Chinese citizen in China. And this is what Associate Director David Warner of the Office of International Security said. But does the government have any indication in the record or show us that it's made any attempt in China? I understand you might say that it's difficult. But do we have anything that tells us that the government tried in the least in China? No, Your Honor. There is not. And the reason for this is exactly what Mr. Warner said, which is that because China is so protective of its defendants, that effort would be futile. And Corona Verdea ---- China has a postal service, I think. Yes, Your Honor. Banging on the door is not the only way to try to get a hold of Mr. Dong. Yes, Your Honor. However, that address is entirely ---- there are two different addresses that appear to be listed. Do we have any addresses if we don't take judicial notice of the documents that we're now for the first time being asked to take judicial notice of? Is there any address without that? No, Your Honor. And if the court looks at the document, it's entirely unclear what that address is. There's a series of numbers and some characters in Chinese. And the agent doesn't read Chinese. It's just ---- it would need to be before the district court and translate it, and then the district court could weigh that. But even if there is an address, the district court found the government was not at fault in trying to not ---- So the evidence that we have, and I think we're right in saying we won't take judicial notice of something that wasn't in front of the district judge, which is basically a factual proposition that could or could not be contested. But we can, if we wish, take judicial notice. I'm not going to. I'm not either. So what we do ---- I read that somewhere last night. But what we do know, because you're saying it, that the United States made no attempt. That is correct. The United States, in this case, put his name into a law enforcement database. This is the same law enforcement database in Aguirre that this Court held was perfectly fine. In Aguirre, there was a five-year post-indictment delay. And the district court in that case found that there was no negligence. And this Court said that that was very significant in a whole. So let me ask you the question that I asked Ms. Chan. Assuming that we were to conclude that the government is, I'll say it this way, at fault, that the government deported him when it didn't have to deport him, knowing that an indictment was likely, after the indictment came down, the government made no attempt to contact him. And then when the first thing he knows about the indictment, so far as the government can show, is he shows up in Canada. And how long was that period? Three years, Your Honor. Three years. Slightly less than three years. What's your view as to whether or not, given that three year, that on my version of this is entirely the government's doing, does the government, does he need to show prejudice or can prejudice be assumed? Your Honor, the government would submit that the district court was correct in this case and that prejudice would need to be shown by the defendant. And what are you going to do with the out-of-circuit cases? Are they just wrong? The out-of-circuit cases, the government believes, are incorrect. However, and more importantly – Are there any out-of-circuit cases that go your way, that says three-year unexcused delay requires showing of prejudice? I do not believe so, Your Honor. This is the gray area between three and five years. So you want a circuit split? Your Honor, in those cases, however, those cases actually show that there was no government negligence in this case. I mean, those cases are cases where the defendant's in state custody and the government knows exactly where a defendant is in state custody and, therefore, they didn't go get him. Those cases really are punishing the government for knowing specifically where the defendant is and not going out and getting him. Well, you know, the government has a little bit to answer for here. I mean, they knew, the government knew, and I'm not talking about the government as a whole. Different pieces of the government knew different things at different times. But it's not like we've got a state and a federal government. The federal government knows that they got him in custody in the United States. They have perfect control over him because he's incarcerated. The federal government knows they're about to indict him, and they send him to China, which is beyond the reach of extradition. I mean, that sounds like, I mean, the government has no excuse. I mean, they just did it, right? Your Honor, I don't agree that the government had just deported him because even though it knew it was about to indict him. As defense counsel said, for the most part of that period, there was no, the government had not made a decision to indict him. But at the time he is deported, does the government know that he is about to be indicted? Your Honor, the e-mails that defense counsel provided showed that the U.S. Attorney's Office is not finished with its process. In addition, it still has to be presented. The most favorable position to you is that at the time that he's deported, the government knows that an indictment is a distinct possibility. It is a possibility. However. Not distinct possibility, just possibility. Yes, a distinct possibility. It still has to be presented before the grand jury. But more importantly, the defendant in this case is deported on the 88th day of his 90-day statutory period. There is nothing in, in fact, the Supreme Court has said you cannot hold someone, be an alien, an uncharged alien, over 90 days unless you're just trying to deport him and you're trying to figure out how to deport him. It is not one of the reasons, under due process, you cannot hold an alien simply because you think you might be charging him very soon. But we've had a lot of cases where, where, where aliens are held for long, long periods, months, months, months, years. Right? In some of those cases, they're, they might have been charged criminally, in which case Zevedes would not apply. And Zevedes would apply if you can review, under Zevedes, pursuant to due process, the only reason to hold someone is because you're trying to continue to deport them. You know, that Davides case was almost entirely overruled in the Kim case, greatly to my regret. I don't know whether you're aware of the Kim case. I am not, Your Honor. I wrote the, I wrote the opinion below. It was reversed. I relied on Davides. And I think the government had it entirely within its control, even pre-indictment, to hold him past 90 days. And, you know, the only experience that I've had with deportation is, I'm trying to remember the case. It'll come back to me. But I issued a member, I think it was on the district court. Maybe not. Maybe this court. I've got to get my computer rebooted, you know, here. But I sent out an order to hold a defendant who was at the airport at LAX. Don't put him on the airplane. Keep him here. And it was phoned over to the authorities. I signed an order. And from the story I got was that, yes, they got the order, but they had already closed the gate. The plane hadn't left the gate, but they'd closed the door. And that was it. And they flew him away. Oh, yeah. He was to India. And then I think I insisted that they bring him back. Well, it took another six, seven months before he came back. I look at hundreds of cases, but I remember that. Yes, Your Honor. So, I mean, there was someone who didn't want to leave. Here you've got someone who wanted to leave. And they expedited that. But to the person who didn't want to leave, I thought we need to keep him here before we can resolve the issues. They pushed him on a plane and flew him away. Yes, Your Honor. Very briefly on Your Honor's point on the government being able to keep him here pre-indictment. Pre-indictment has a very different standard than post-indictment. The government is not under a timeline to indict the defendant. I understand that. Yes. You were saying at the expiration in 90 days of his immigration incarceration, the government had no choice but to release him. Yes. I do not think that's correct. And, Your Honor, I apologize for that because that is an overstatement on my point. The government's only point in this case was that this decision, if the decision So why did you make that statement? I got overexcited. You kind of thought it might help. I understand. I got a little overexcited. It's okay. This decision, Your Honor. Those cases just came up recently out of San Diego holding people. The Leo DeCarmen case. I don't remember the names of them. But that is a material witness case, Your Honor. That's very different. I get this new and noteworthy. It gives you all this stuff, and I remember something about it. But then you said 90 days, and I thought, well, maybe I'm getting old. In Leo DeCarmen, that's a material witness who's in the criminal proceeding, which is the target. As you probably know, I know that case very well. Yes. And I saved you from even harsher language from Judge Kaczynski in the drafting of that opinion. That is very true. I mean, you got raked over the coals, and you might have been raked over the coals even worse, just so you know. Absolutely, Your Honor. And in that case, however, a material witness has a reason to be in this country, because they need to provide exculpatory information. In this case, he's an uncharged defendant, and this decision would create ---- I have to say, I don't find that case particularly relevant here, one way or the other. Yes, Your Honor. The government's only point on the deportation is that very perverse incentives would be created if the indictment was dismissed. No real theft was made to contact him. You know, they just, okay, well, we'll put it on ice, and, you know, it's like a traffic ticket. Maybe somebody will stop him somewhere, and they do a, run a computer search. Oh, we got him, you know. That's why we have in L.A. probably, oh, 500,000 outstanding warrants. Nobody goes around trying to serve them because, you know, especially with minority people, they stop them and cite them, you know, tickets and all that. So you build that up, and if you stop them again, you go through, and you find, oh, there's a warrant. So leave your car here. We'll tow it away. We'll do an inventory search, and let's go. So there was no attempt here. That is correct, Your Honor. And the government would submit it's because he's a traitor. He went to the Chinese embassy and said, you know, we'd like to contact him. Now, we know that extradition isn't easy, but could you just, you've got his address. He wrote all this stuff out. I mean, look, we've got plenty of people in L.A. that can read Chinese, you know. So they can figure out, read that. They have the address. You write them a letter. No attempt was made. No attempt was made. However, the district court found, based on the testimony that was not cross-examined, that it was not the fault of the government because he was in China. It did not have the address in front of it, and there's no phone number even in that document. Did the district court have his correspondence? Of the government trying to keep him here because it thought it was a case they wanted to prosecute him? Yeah, yeah. Did they have that? Yes, absolutely. All this stuff that went through? Absolutely. I thought you said this wasn't in the record. The page in Chinese indicating the numbers where the address would be was not before the district court. I'm talking about this other stuff I read. The e-mail correspondence within immigration was before the district court, and certain of those e-mails were provided to the district court in the defendant's reply brief. So all the stuff I read is in the record, right? I believe certain of those e-mails are in the record. In the request for judicial notice that defendant provided to this court, some of those e-mails were provided to the district court. Did they send it to and from? Did any of that stuff, you know? I believe that those e-mails were, Your Honor. What? I believe that those e-mails were before the district court, Your Honor. They were? Yes, Your Honor. I thought that I just heard that none of it was in the record. Oh, no, Your Honor. If I said that, I misspoke again. I've taken judicial notice about something. That would just be on, Your Honor, the address form that defendant provided. All right. Okay. I see that I'm out of time in asking you questions. No, no. This is irrelevant, I think, to this case, but you might be interested in reading the Supreme Court's opinion in Kim. Yes, Your Honor. Specifically, not just Chief Justice Rehnquist's majority opinion, but Justice Souter's dissent, where Justice Souter says, I have looked everywhere in the record for what Chief Justice Rehnquist says is in the record and justifies continuing to hold him. You can look in the record, too. You'll be just as unsuccessful as Justice Souter was in finding in the record what Chief Justice Rehnquist said was in the record. Thank you, Your Honor. Those guys aren't perfect, either. No, I used to read Prosser and Torch, you know, in law school. He was the dean up at Berkeley. And he had all these footnotes. You go look at a footnote, it had not a damn thing to do with what was in the page on the book that was cited. I mean, I learned something about that. That's how you become an authority on Torch. Yeah, well, I didn't take Torch from him. I took it from Ballantyne. But I bought the book and read it, and it was helpful. I didn't disagree with his approach. And I could see why he might put in a few fictitious footnotes to bolster his views. Anyway, it sold a lot of copies. I just want to make a few things clear based on what Ms. Shea represented. She indicated there's no evidence in the record that the U.S. Attorney's Office was prepared to indict. But, frankly, in the record at ER 123, we have an email that says, Now the AUSA's boss has signed off on the indictment. And I will be speaking with the AUSA tomorrow to see what day I can go before the grand jury. So there is, in fact, evidence in the record that the U.S. Attorney's Office was prepared to indict on August 1st. And Mr. Dong was deported on August 14th. So what's the bottom line to that? The bottom line to that is that they deported him knowing that they were going to indict him, and they did not, to accept the government's representation, they did not bother to advise him, you know, you're going to be indicted, so where should we send the indictment to you? They didn't tell him any of that. They just said, okay, well, we'll just deport you. They never advised him, if we deport you, it doesn't mean we're not going to indict you. As soon as we indict you, we will send you to your address, which is or is not in the record, the indictment, and then it will be your choice whether you should come back or not. They didn't do it. That's at ER-123? That's at ER-123, and the government has emphasized numerous times that the district court found that he knew he was under investigation. Of course he knew he was under investigation. He was arrested. In fact, he called them and said, I'd like to speak to you. But a month passed after he called them and said, I'd like to speak to you, and he was not indicted. And the district court also finds, and it's at ER-13, that he was not fleeing, that this wasn't somehow his fault, that he was fleeing an indictment. The district court specifically found that at ER-13 where it said, no, we're not blaming this on you at all. It's just sort of irrelevant. As far as Aguirre, the ministry has represented that Aguirre is on all fours, that just putting someone's name in NCIC is enough. Aguirre is a totally different case. In Aguirre, the government had looked for Mr. Aguirre. He went to England. He knew he was under indictment. In fact, he swore out a declaration at the US embassy in England saying, I can't come back for the court appearance that you told me about because of my work obligations. But as soon as I return to the United States, I will report. And right after he said that, right after he swore out a declaration, he returned to the United States, and he never reported to court. And in those circumstances, the court held it was enough at that point that it was his fault. It wasn't the government's fault. This is a totally different case. We don't have them writing a letter to Mr. Dong and Mr. Dong going to the embassy and saying, I can't return to the United States right now because you haven't given me a parole to return to the United States. But as soon as you do parole me in, I will return. And that sort of brings me to my last point, is there's a lot of stuff in this case that didn't make it into the record. And I don't know why that is. Well, we shouldn't probably talk about that then, should we? Well, the attorney who tried this case is no longer with our office. But given the fact that those documents are not in the record, at least. I keep on hearing on each one of these cases about the attorneys that first represented people who get trashed in every case, it seems like. Every one of the immigration cases. I'm sorry. My point was not that I should trash her. My point is that I think it's undisputed, the government does not dispute, that they actually did have Mr. Dong's home address. And if you want the district court to address this. No, I know what George is going to do. Excuse me? I know what Judge Wu is going to do if we send him back. That's okay. Well then, I just wanted to say, if you were to send it back, that it should be a reversal and remand, and not simply a remand. Because Mr. Dong has been deported to China again. And if this court were simply to remand. Now, do we know that? Excuse me? You say he's been deported to China again. Do we know that? I mean, is that in the record? Well, it's not in the record. Because at the time that I briefed the case, he was still in custody. Well, so I guess it's not in the record. We don't know that then. Go ahead. I would just say that it would be sort of to repeat the error. Because the government would have no incentive to bring him back if the conviction remained. Well, okay. Well, let me ask Christina Hsieh. Is that? I mean, you don't have to answer if you don't want to. But did the government have his address in China? That document that defense counsel has submitted was in defendant's A file, alien file. And so that document was in the government's file. The government does not contest that. In fact, it produced it to defendant before the motions hearing on this case. That document, however, the government would submit if it were to argue it in front of the district court. Again, this is not in the record. It's conclusive. Well, you know, did the government have his address in China? In a word, Your Honor, inconclusive. I don't know what those numbers mean. It's 36-1-1-6-7. I don't know what those numbers mean, Your Honor. And in addition, the district court could make a finding of fact that the defendant may not have been honest. It looks like he started to write his telephone number, then scratched it out and then put 86, which is just the country code for China. The government doesn't know what that document says. What was the document? Just tell me. The document is for him to provide contact information when he goes back to China, Your Honor. Okay. So they normally put their address in there? There is a blank for the address. A blank for it? Yes, Your Honor. So was something written in the blank? There are characters written in the blank, Your Honor. Okay. But the government doesn't know if that's a real address, if that's a fake address. But there was his address in there. There was an address there, Your Honor. There was an address there. Okay. There was an address there. I don't know if it's an address. I can't represent that to the court. But there was something written in the document. I mean, completely outside the record. But the government really didn't have any intention to try to locate him in China. Because the government could not. I don't read Mandarin very well, but it seemed to me that entirely possible those characters in the address form said, Catch me if you can. I'm teasing. I don't read Mandarin at all. Well, we have judges that read Mandarin. Yes, Your Honor.  Yes, Your Honor. And I don't know if Judge Wu read Mandarin, but that document was not presented to him. No, Wu, no. The other judge does not read Mandarin.  Thank you, Your Honor.
judges: Piersol, Pregerson, Fletcher